**SO ORDERED.**

**SIGNED this 4th day of January, 2013.**





THOMAS W. WALDREP, JR.
UNITED STATES BANKRUPTCY JUDGE

---

**UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DAVID MARKEY, | ) | Case No. 12-10852 |
| | ) | |
| Debtor. | ) | Chapter 13 |
| _____ | ) | |

**<u>MEMORANDUM OPINION</u>**

 Three related motions are before the Court: the Amended Motion for Turnover (the "Turnover Motion") filed by the above-referenced debtor (the "Debtor") on October 22, 2012; the Motion for Relief from the Automatic Stay (the "Motion for Relief") filed by David Morgan ("Morgan") on November 1, 2012; and the Motion to Extend Time to Challenge Discharge and Dischargeability of Debt and Extend Time to File Proof of Claim (the "Motion to Extend") filed by Morgan on October 26, 2012.  Upon consideration of the pleadings, the arguments of counsel, and the evidence presented at the hearings held on November 15, 2012, the Court will grant the Turnover Motion, deny the Motion for Relief, and deny the Motion to Extend.

FACTS

(Or, A Tale of Two Titles)

This opinion is about the ownership of a vehicle, and not just any vehicle: a red 1968 Ford Mustang convertible (the "Vehicle").  The Debtor and Morgan both claim to own the Vehicle, and the story that follows is an improbable tale of how something as simple as the ownership of titled personal property can become so convoluted that a court is needed to determine the owner.  Each party tells a different version of the story, and both cannot be true.  Thankfully, the Court is not required to determine which party is telling the truth and which is misstating it, at least not in each instance where the stories diverge.  Instead, the Court must determine which party, if any, has met his burden of proof and rule accordingly.  Ultimately, this is not a contest between the Debtor and his former friend, Morgan; rather, this is a contest between Morgan and the Debtor's creditors, represented by the standing Chapter 13 trustee (the "Trustee").

Our story begins simply enough.  The Debtor and Morgan were once good friends.  They worked together as employees of a copier service, Triad Business Solutions.  Later the friends decided to go into business together, and they became partners in a small car wash business, M&M Marketing. The business borrowed money to purchase the car wash, and both Morgan and the Debtor personally guaranteed the loan.  Only the Debtor and Morgan had keys to the car wash and the cash machines that were part of the business.

Unfortunately, for reasons that are not clear, the car wash regularly lost money. Although the financial failure of M&M Marketing is not directly related to the ownership of the Vehicle, it is relevant in two ways.  First, it serves as a basis for Morgan's assertion that the Debtor owes him a substantial amount of money and that the Debtor gave him the Vehicle to partially satisfy

that debt.  Second, because Morgan challenged the Debtor's veracity,[1] character evidence was admitted during the hearing.  Morgan presented a witness, Kimberly McLendon-Ellis ("McLendon")[2], who testified that the Debtor had a reputation for untruthfulness.  See Fed. R. Evid. 608(a).  The financial failure of M&M Marketing, along with other personal knowledge, served as the basis for McLendon's opinion.[3]

---

[1]Indeed, the Debtor challenged Morgan's veracity as well.

[2]"Familiarity breeds contempt - and children."  Mark Twain (1835-1910). McLendon is the mother of the Debtor's child (now eight years old).  McLendon testified that she dated and lived with the Debtor in 2002 and 2003.  During that time, after getting off work at a nearby hair salon, she would meet the Debtor at the car wash two to three times a week, after business hours. McLendon testified that she witnessed the Debtor empty money from each cash machine into a five-gallon bucket and that he did this two to three times per week during the time that they were dating.  She implied that the Debtor did this without Morgan's knowledge and that the Debtor was stealing from his business partner.  McLendon testified that in March of 2004, she and the Debtor took a trip to Hilton Head, South Carolina. As a result of a substantial disagreement, McLendon left, taking their then-infant son and the Debtor's briefcase, and drove back to North Carolina. At some point during her drive, she opened the briefcase and discovered eight 100 dollar bills that the Debtor had concealed from her. She later received a voicemail message on her cell phone from the Debtor, who threatened her if she did not bring the briefcase back. McLendon stated that she called Morgan, informing him of the messages and the money, and later delivered the money to Morgan.  However, Morgan testified that it was not until he had a chance encounter with McLendon in 2012 that he first learned of the Debtor's alleged embezzlement. Although the credibility of a witness may be attacked, Fed. R. Evid. 403(a)(3), 607, specific instances of the conduct of the witness that are probative of truthfulness or untruthfulness may not be proved by extrinsic evidence. Fed. R. Evid. 608(a). Specific instances of conduct of the witness (e.g., the Debtor) may not be developed upon direct examination by the opposing party (e.g., Morgan).  Id.  Inquiry may only be made on cross-examination.  Since this portion of McLendon's testimony was only elicited by Morgan on direct examination, the Court will disregard it.

[3]The Debtor also challenged McLendon's veracity and successfully demonstrated that she was biased against him.  Among other things, she testified that the Debtor refused to sign the birth certificate of their son and acknowledge responsibility for him.  On cross examination, McLendon acknowledged that she had been married four times, had unsuccessfully pressed assault charges against the Debtor, and had an assault charge brought against her by the Debtor as well (both charges were dismissed).

3

Sometime in 2005, M&M Marketing began experiencing financial difficulty. Morgan testified that the "numbers weren't adding up." The business defaulted on its loan, and the lender began a foreclosure. Morgan testified that he was able to stop the foreclosure by making payments to the bank from his personal funds. The Debtor's cross-examination also revealed that, at some point, Morgan, the Debtor, and two other parties were sued in state court, which resulted in Morgan and another company, Carolina Copier Solutions, agreeing to pay a settlement of $67,611.44. Morgan testified that the Debtor verbally agreed to reimburse Morgan for one-fourth of the settlement amount. The Debtor denied making any such agreement, and no written agreement to indemnify Morgan was introduced into evidence.

In October of 2007, Morgan took the keys to the car wash from the Debtor because he wasn't paying for his half of the losses.[4] Morgan also engaged an attorney who assisted Morgan and the Debtor in transferring the Debtor's half of the stock in M&M Marketing to Morgan, who then became the sole owner of the business.

The Debtor testified that in 2008 he fell upon hard times. Strapped for cash, his only unencumbered asset was the Vehicle. According to the Debtor, he and Morgan were still good friends, and selling the Vehicle was the only way for the Debtor to raise funds. The Debtor testified that he and Morgan agreed that Morgan would make some needed repairs to the Vehicle because Morgan was more "mechanically inclined."[5] Afterwards, Morgan and the Debtor would

---

[4]Apparently the Debtor and Morgan had an agreement that they would each fund half of any business losses of M&M Marketing.

[5]Morgan denied the Debtor's statement that he was a mechanic or more "mechanically inclined" and stated he took the Vehicle to a mechanic for the repairs, but a December 17, 2009, letter from Morgan's attorney, discussed below, indicates that Morgan and his son were "in the repair business."

4

sell the Vehicle, and reimburse Morgan for the cost of the repairs from the sale proceeds. Although Morgan denied that the two were still friends or that he was a mechanic, the Debtor explained that he took the Vehicle to Morgan in furtherance of this verbal agreement. Morgan agreed to it because, as the Debtor explained, "that's what friends do."

Morgan tells a very different story. He testified that the Debtor had been avoiding Morgan because the Debtor owed him over $30,000 in business debts and, as a result, they were not friends at all. In early 2008, after calling and e-mailing the Debtor over 100 times without result, Morgan chanced to meet the Debtor at a Lowe's Home Improvement store. Morgan confronted the Debtor and complained "I can't believe you left me stuck with this," referring to the Debtor's portion of the business debts that Morgan had paid. Morgan testified that the Debtor offered to give the Vehicle to Morgan to partially repay the debt.

According to a complaint filed in state court by the Debtor on March 21, 2012, the Debtor took the Vehicle to Morgan for the repair work. However, Morgan testified that he and his son went to the Debtor's home to get the Vehicle on April 10, 2008, and needed to jump start the Vehicle because it would not start. Morgan testified that, although the Debtor agreed to give Morgan the Vehicle and sign over the title, he was not surprised when the Debtor did not produce the title and claimed that he could not find it when Morgan arrived at the home. Morgan testified that, at the time, he thought "at least I have the car." Morgan testified that he mistrusted the Debtor, so before he went to get the Vehicle, he typed an agreement, dated April 10, 2008 (the "Agreement"), and he and the Debtor both signed it that day.[6] The Debtor

_____

[6]The entire Agreement is as follows: "Agreement between David Markey and David Morgan, David Markey is to sign over the title and rights of the ford 1986 Mustang to David Morgan for payment of past due invoice's (sic) paid by David Morgan for M&M Marketing bills for 2007 that total over $25000. The estimated value of the 1986 Mustang is $12,000." Morgan

5

emphatically testified, several times, that he never saw the Agreement until it was produced in the state court lawsuit, and that he never signed the Agreement.[7]

Morgan either repaired the Vehicle or caused it to be repaired.[8]  According to the Debtor, only one potential buyer ever viewed the Vehicle; to the contrary, Morgan testified that he had multiple offers on the Vehicle, but he could not complete a sale due to the lack of a title.[9]  And so the Vehicle sat in Morgan's garage.

In December of 2009, approximately eighteen months after Morgan obtained possession of the Vehicle, the Debtor repeatedly requested return of the Vehicle, and Morgan repeatedly refused.  Finally, Jack B. Bayliss, Jr., an attorney hired by Morgan, sent a letter to the Debtor, dated December 17, 2009 (the "Letter"), seeking $3,165.00 for storage, service, parts, and materials and asserting a possessory lien pursuant to N.C. Gen. Stat. § 44A-2.  The Letter stated that the Debtor gave "keys to and custody of" the Vehicle to Morgan, authorizing its sale to reduce the debt owed to Morgan.  The Letter further explained that Morgan and his son were in the repair business and had been storing the Mustang in the garage at his business.  The Letter alleged that Morgan had interested buyers, but the Debtor either "could not find the title or

---

testified that he inadvertently inverted the numbers and intended the Agreement to convey an interest in a 1968 Mustang, not a 1986 Mustang.

[7]The Debtor testified that he and Morgan signed other agreements when they were business partners, but no such agreements were ever shown to the Court or introduced into evidence.

[8]Morgan testified that the repairs included fixing the back seat, replacing the carburetor, performing a "tune up," and changing the spark plugs and oil.  The Debtor testified that Morgan told him that the repairs cost $415.00.

[9]The record does not reflect who or how many people viewed the vehicle, if anyone made an offer to purchase the Vehicle, the amount of any offer, and, if offers were made, who refused them.

would not deliver title, despite [the Debtor] turning the vehicle over to [Morgan] to sell and keep the proceeds." According to the Letter, Morgan was willing to allow the Debtor "to take possession of the 1967 Mustang (sic) after [the Debtor had] paid for his services and reasonable storage charges," and he "would be glad to discuss these figures with [the Debtor] and any reasonable arrangements for the return of the 1967 Mustang."[10] Finally, the Letter expressed Morgan's preference that the Debtor deliver the Vehicle's title to Morgan so that he could sell it to reduce the Debtor's debt. When faced with the many inconsistencies between the Letter and his testimony, Morgan availed himself of the only remaining grace-he denied assisting his own attorney in preparing the Letter. Morgan also testified that he has not been paid for the repairs.

In May of 2011, Morgan had been in possession of the Vehicle for over three years, but he still had no title. He had been unsuccessful in his attempts to get the title from the Debtor, so he decided to obtain a new title. Morgan placed a telephone call to the North Carolina Department of Motor Vehicles (the "DMV"), seeking instructions on how to obtain a replacement title. He obtained and completed the necessary DMV forms and obtained the required indemnity bond on May 31, 2011. On July 22, 2011, Morgan signed a Title Application, selecting boxes on the form that indicated that the Vehicle was "purchased used" "for use in NC from [the Debtor] on 4/10/08," without listing a price. Although the affidavit to the Title Application requires answers in detail and documents showing proof of ownership, including bills of sale, no documentation, not even the Agreement, was attached. When the Title Application requested information as to what steps he had taken to obtain the original title,

---

[10]In spite of the fact that the Agreement described the Vehicle as a 1986 Mustang and the Letter described it as a 1967 Mustang, the Court assures the reader that the model year was in fact 1968.

7

Morgan wrote only "multiple phone communication. On each call he stated he still could not find title." On July 29, 2011, a DMV License & Theft Bureau inspector signed the Application and attached a picture of the Vehicle, remarking only that "VIN verification only for what appears to be a 1968 Ford Mustang and the public VIN has been verified. NICB checked for theft history and no record found." The ownership document listed was an "Indemnity Bond." On August 25, 2011, the DMV issued a title to the Vehicle in Morgan's name.

By March of 2012, Morgan had been in possession of the Vehicle for almost four years. On March 21, 2012, the Debtor filed a lawsuit against Morgan in Guilford County Superior Court, seeking possession of the Vehicle or damages. A copy of the title to the Vehicle, showing the Debtor as the owner, was attached to the complaint,[11] which correctly listed Morgan's name and address as the defendant.

On June 13, 2012, the Debtor filed his Chapter 13 petition but did not list Morgan as a creditor. The first meeting of creditors was held on July 13, 2012. On September 4, 2012, Morgan, obviously not yet aware of the Debtor's bankruptcy, filed an answer and counterclaim against the Debtor in the state court action. On September 21, 2012, the deadline to object to the Debtor's discharge or to challenge the dischargeability of particular debts passed.

On September 28, 2012, the Debtor filed the Turnover Motion. That same day, the Debtor filed an amended schedule F to list Morgan as an unsecured creditor. On October 3, 2012, the notice of the hearing on the Turnover Motion was sent to Morgan. On October 5, 2012, Morgan's attorney sent the Debtor's attorney a copy of the counterclaim that had been filed in the state court action. On October 21, 2012, the deadline for filing proofs of claim

---

[11]By this time, the Debtor had found the title.

expired.  On October 26, 2012, Morgan filed a proof of claim and the Motion to Extend.  On November 1, 2012, Morgan filed the Motion for Relief, asserting, among other things, that the Debtor owed him the sum of $81,012.90.  According to Morgan, the Vehicle remains in his garage.

JURISDICTION

This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina.  This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (E), (G), and (O), which this Court has the jurisdiction to hear and determine. Pursuant to the analysis in Stern v. Marshall, 564 U.S. --, 131 S. Ct. 2594 (2011), the Court may enter a final order in this matter.

ANALYSIS

**I.      The Ownership of the Vehicle**

There is no dispute that the Debtor owned the Vehicle in early 2008 and that the Vehicle came into the possession of Morgan in April of that year.  However, the Debtor and Morgan disagree about whether the Debtor intended to transfer ownership of the Vehicle to Morgan. Thus, the preliminary issue is whether ownership was transferred to Morgan.  The party bearing the burden of proof on a particular issue is the party that "will be defeated as to the particular issue or the entire case if no evidence relating thereto is given on either side." Johnson v. Johnson, 50 S.E.2d 569, 572 (N.C. 1948).  The law in North Carolina is quite clear: title to a

motor vehicle does not pass until the certificate of title has been assigned, and the vehicle and the title have been delivered to the new owner.[12]

The burden of proving the validity of the Agreement falls upon Morgan.  The Debtor testified that he gave possession of the Vehicle to Morgan to repair it before it was sold and believed that he retained ownership of the Vehicle.  Morgan testified that they agreed that the Vehicle would be transferred to him in satisfaction of a debt, and, in support of his assertion, produced the Agreement.  The Debtor repeatedly denied signing the Agreement. Other than his own testimony, Morgan failed to present any evidence that the Debtor did in fact sign the Agreement, whether by the comparison of signatures, the testimony of a third party witness to the signature, or the testimony of a handwriting expert.  The Court in unpersuaded by Morgan's testimony. The Agreement further failed to properly identify the Vehicle and contained an incorrect description of it.  Consequently, Morgan failed to demonstrate that the Debtor assigned and delivered title to Morgan, or that he even intended to do so.

In the Title Application, Morgan made several incomplete and misleading statements and failed to attach, or even mention the existence of, the Agreement.[13]  The Court concludes that

---

[12]"The General Assembly used the word 'title' as a synonym for 'ownership' in enacting the 1963 amendment, which provides that 'no title to any motor vehicle shall pass or vest until such assignment is executed and the motor vehicle delivered to the transferee.'  Nationwide Mut. Ins. Co. v. Hayes, 276 N.C. 620, 174 S.E.2d 511, 7 U.C.C. Rep. Serv. 1105 (1970).  No title passes to the purchaser of a motor vehicle until the certificate of title has been assigned by the vendor, and delivered to the vendee or his agent, and the motor vehicle delivered to the transferee.  Int'l Serv. Ins. Co. v. Iowa Nat. Mut. Ins. Co., 276 N.C. 243, 172 S.E.2d 55 (1970); Nat'l Bank of Sanford v. Greensboro Motor Co., 264 N.C. 568, 142 S.E.2d 166 (1965); Nationwide Mut. Ins. Co. v. Hayes, 7 N.C. App. 294, 172 S.E.2d 269 (1970), judgment aff'd, 276 N.C. 620, 174 S.E.2d 511, 7 U.C.C. Rep. Serv. 1105 (1970)."  Eleanor Grossman, et al., 3 STRONG'S NORTH CAROLINA INDEX § 285 (4th ed. 2012).

[13]Had Morgan done so, the Agreement might have raised several issues with the DMV.

10

Morgan failed to provide the DMV with complete and accurate information to be used in evaluating the Title Application. As a result, the title issued by the DMV to Morgan was done so based on the misstatements and/or fraud of Morgan, and fails to transfer ownership to Morgan.

The Court's conclusion is supported by other facts. The Debtor consistently took the position that the Vehicle belonged to him.[14] The same consistency cannot be found in Morgan's course of action. The Letter, written by Morgan's attorney, asserts that Morgan has a statutory lien on the Vehicle, which is wholly inconsistent with Morgan's ownership of it. In the Motion for Relief, Morgan asserts that the Debtor defaulted under the Agreement and that there was insufficient equity in the Vehicle to adequately protect his interest. Such arguments are made by creditors, not owners. The evidence before the Court is insufficient to establish that ownership of the Vehicle was transferred to Morgan under North Carolina law. Accordingly, ownership of the Vehicle remains with the Debtor.

## II.    The Motion for Relief from Stay

Morgan requests that the Court modify the automatic stay to allow him to continue to prosecute his counterclaim against the Debtor in state court, which the Court interprets as a request to modify the stay under Section 362(d)(1) "for cause."[15]  In determining whether cause

---

[14]The only evidence to the contrary is McLendon's testimony that the Debtor told her husband that he gave the Vehicle to Morgan, but her testimony was so biased as to be of little probative value.

[15]The Bankruptcy Code enables courts, upon request of a party in interest and after notice and a hearing, to grant relief from the automatic stay for cause. 11 U.S.C. § 362(d)(1). A party requesting relief from the automatic stay has the burden of proof as to whether the debtor has equity in the property and the opposing party bears the burden of proof on all other issues. 11 U.S.C. § 362(g); In re Joyner, 416 B.R. 190, 192 (Bankr. M.D.N.C. 2009) (stating that the party opposing relief from stay has "the burden of persuasion (or risk of non-persuasion) as to whether the stay should be left in effect").

has been shown to lift the stay, courts must "balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." In re Robbins, 964 F.2d 342, 345 (4th Cir. 1992). In such cases, courts consider certain factors, including "(1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court." Id.

Morgan has failed to sustain his burden of persuasion.  Ownership of the Vehicle has now been decided, so there is no need for the parties to return to state court.  Morgan's proof of claim will be handled through the normal claims allowance process.  See 11 U.S.C. § 502; Fed. R. Bankr. P. 3007.  Denying the Motion for Relief is less burdensome on the Debtor and promotes judicial economy.

Morgan's argument that he has an "ownership interest" in the Vehicle is without merit. However, Morgan also alleges that he is owed a debt by the Debtor, which is indicative of being a creditor.  If the Court interpreted the Motion for Relief as a request by Morgan to modify the stay under Section 362(d)(2) to enforce his rights as a creditor under state law,[16] then Morgan

---

[16]The movant must show a debt owed, possession of a valid security interest that secures the debt, that the collateral securing the debt is declining in value, and that the debtor is not adequately protecting its interest.  In re Carroll, 2012 WL 931627 at *2 (Bankr. E.D.N.C. Mar. 19, 2012) (quoting In re Vankell, 211 B.R. 205, 215 (Bankr. E.D. Tenn. 2004)).  Showing the security interest and a default in payments, alone, is insufficient for a grant of relief. .In re Carroll, 2012 WL 931627, at *2 (Bankr. E.D.N.C. Mar. 19, 2012) (citing In re Szymanski, 344 B.R. 891, 897 (Bankr. N.D. Ind. 2006)).

would still fail because he has not demonstrated possession of a statutory lien on the vehicle, the value of the Vehicle, a decline in its value, or that the Vehicle is unprotected.[17]  Accordingly, the Court finds no basis for modifying the automatic stay under Section 362(d)(1) or (2), and the Motion for Relief will be denied.

Under North Carolina law, Morgan may possess a statutory lien for the work performed on the vehicle.[18]  To the extent that Morgan asserts such a lien in a motion filed with the Court, a hearing will be held to determine the existence and amount of the lien.

### III.    The Turnover Motion

The Bankruptcy Code requires a party in possession of property that the trustee may use, sell or lease, to deliver the property, or the value thereof, to the trustee.  11 U.S.C. § 542(a). "The burden of proof in a turnover proceeding under § 542 is at all times on the party seeking turnover and that party must establish a prima facie case by a preponderance of the evidence." In re Green, 1995 WL 1938989, at *2 (Bankr. D.S.C. Jan. 27, 1995) (citing In re Weiss-Wolf, Inc., 60 B.R. 969 (Bankr. S.D.N.Y. 1986)); In re Minh Vu Hoang, 2012 WL 4320846, at *7 n.9 (Bankr. D. Md. Sept. 20, 2012) (stating that the party seeking turnover of property of the estate has the burden of proof).[19]

_____

[17]Morgan testified that the Vehicle was being protected.

[18]"Any person who repairs, services, tows, or stores motor vehicles in the ordinary course of the person's business pursuant to an express or implied contract with an owner or legal possessor of the motor vehicle, except for a motor vehicle seized pursuant to G.S. 20-28.3, has a lien upon the motor vehicle for reasonable charges for such repairs, servicing, towing, storing, or for the rental of one or more substitute vehicles provided during the repair, servicing, or storage."  N.C. Gen. Stat. § 44A–2(d) (2011).

[19]However, the Code is silent on the applicable standard of proof for such a burden. Matter of Alofs Mfg. Co, 209 B.R. 83, 90 (Bankr. W.D. Mich. 1997).  In the absence of statutory authority, many courts have relied on pre-Code Supreme Court cases to apply the clear and

13

The Debtor has met his burden of proof by demonstrating that Morgan is in possession of property that the Trustee may sell for the benefit of creditors.  The Vehicle is property of the estate.  See 11 U.S.C. § 541(a).  Accordingly, the Turnover Motion will be granted.

**IV.    The Motion to Extend**

A.  Extension of Time to File a Proof of Claim

On September 28, 2012, the Debtor filed an amended schedule F to list Morgan as an unsecured creditor.  On October 3, 2012, the notice of the hearing on the Turnover Motion was sent to Morgan.[20]  On October 5, 2012, Morgan's attorney sent the Debtor's attorney a copy of the counterclaim that had been filed in the state court action.[21]  On October 21, 2012, the deadline for filing proofs of claim expired.  On October 26, 2012, Morgan filed a proof of claim.

Morgan requests that the Court retroactively extend the time for him to file a proof of claim.  Both the Debtor and the Trustee object.  In a Chapter 13 case, a bankruptcy court may only extend the claims bar date upon one of the exceptions enumerated in Rule 3002(c).  Fed. R. Bankr. P. 9006(b)(3); In re Young, 2007 WL 703493, at *5 (Bankr. M.D.N.C. Mar. 2, 2007) (quoting In re Pyle, 201 B.R. 547, 549 (Bankr. E.D. Cal. 1996)); In re Denny, No. 01-81440

---

convincing standard of proof.  Id.  A minority of courts follow the Supreme Court in Grogan v. Garner, 498 U.S. 279, 286 (1991), which held that the preponderance of the evidence standard was appropriate in nondischargeability actions under Section 523(a).  Id. ("Because the preponderance of the evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants, unless 'particularly important individual interests or rights are at stake.'").

[20]Morgan testified that he did not receive the notice because it was mailed to him at "5507 Pepper Mill Road" instead of "6507 Pepper Mill Drive."  In spite of this inconsistency, the Court's docket reflects that the notice was not returned to the Bankruptcy Noticing Center.

[21]This sequence of events causes the Court to conclude that Morgan received the notice of the hearing on the Turnover Motion and promptly informed his attorney, who then sent the state court counterclaim to the Debtor's attorney.

14

(Bankr. M.D.N.C. Dec. 27, 2002); In re Davis, 108 B.R. 95, 97 (Bankr. D. Md. 1989), aff'd, 936 F.2d 771 (4th Cir. 1991); In re S.A. Morris Paving Co., Inc., 92 B.R. 161, 163 (Bankr. W.D. Va. 1988). The deadline set by Rule 3002 for filing a proof of claim is an absolute deadline. The situation at hand does not meet any of the exceptions enumerated in Rule 3002(c), nor did Morgan allege any exceptions. Thus, this Court has no ability to extend the time in which Morgan is permitted to file a proof of claim. Even if the Court had the authority to extend the deadline, the record reflects that Morgan received notice of the Debtor's bankruptcy by October 5, 2012, which was 21 days before the deadline passed. Therefore, as to the extension of the deadline for Morgan to file a proof of claim, the Motion to Extend is denied.

B. Extension of Time to Object to the Debtor's Discharge

Pursuant to Rule 7001(4), a proceeding to object to a discharge, on grounds other than to revoke a previously granted discharge, is an adversary proceeding. Fed. R. Bankr. P. 7001(4). In a Chapter 13 case, a complaint objecting to the debtor's discharge under Section 1328(f)--a previously granted discharge--must be filed within sixty days of the first day set for the meeting of creditors under Section 341(a). Fed. R. Bankr. P. 4004(a). Upon the filing of a motion before the period expires and after a hearing or the opportunity for one, a court may extend the time to file a complaint objecting to discharge under Section 1328(f). Fed. R. Bankr. P. 4004(b). However, the Code does not set a deadline for filing an objection to discharge based on any other provision of the Code. See In re Hadley, 2011 WL 3664746, at *13 (Bankr. E.D. Va. Aug. 19, 2011) (noting that a party-in-interest may object to the discharge of a debt under other subsections of Section 1328 after a court grants a discharge).

Here, neither the Debtor's petition nor any testimony offered at the hearing indicates that the Debtor previously filed a bankruptcy petition, let alone received a discharge. Accordingly, an

objection to discharge under Section 1328(f) is not applicable.  As the Code only prescribes a deadline for objecting to discharge under Section 1328(f), no extension of time is necessary to allow Morgan to file an objection to the Debtor's discharge.  Therefore, as to the extension of time for Morgan to object to the Debtor's discharge, the Motion to Extend is denied.

     C.   Extension of Time to Object to the Dischargeability of a Debt

     A creditor may file a complaint challenging dischargeability of any debt, other than under Section 523(c), at any time.  Fed. R. Bankr. P. 4007(b).  Section 523(c)(1) provides:

> Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section.

11 U.S.C. § 523(c)(1).  The subsections referenced in Section 523(c)(1) generally exempt debts arising from fraud, false pretenses, embezzlement, larceny, or willful and malicious injury. 11 U.S.C. § 523(a)(2), (4), & (6).  A complaint to determine the dischargeability of a debt under Section 523(c) must be filed within sixty days of the first day set for the meeting of creditors under Section 341(a), however, "on motion of a party in interest, after hearing on notice, the court may for cause extend the time fixed under this subdivision ....before the time has expired." Fed. R. Bankr. P. 4007(c).

     Pursuant to Rule 9006(b)(3), the time for filing a complaint objecting to the nondischargeability of a debt under Rule 4007(c) may be enlarged "only to the extent and under the conditions stated" in that rule.  Rule 4007(c) requires that a motion to extend time be filed before the period has expired.  Generally, this Court has no authority to extend the period to file a complaint to object to the dischargeability of a debt pursuant to Section 523(a)(2), (4), or (6).

16

However, Section 523(a)(3)(B) "excepts from discharge any 'fraud' debt neither listed nor scheduled in time to permit a creditor to file a dischargeability complaint."  In the Matter of Johnson, 208 B.R. 746, 749 (Bankr. S.D. Ga. 1996).  Thus, where a creditor lacked notice or actual knowledge of a bankruptcy case in time to file a complaint, the "remedy lies in section 523(a)(3)(B) rather than an untimely motion to extend."[22]  In re Joyner, 2009 WL 1490844, at *1 (Bankr. M.D.N.C. May 27, 2009).[23]  See also In re Erickson, 2012 WL 2974736, at *2 (Bankr. D.S.C. July 19, 2012) (noting that Section 523(a)(3)(B) provides an exception to the deadline for nondischargeability complaints); In re Cameron, 305 B.R. 94, 97 (Bankr. M.D. Fla. 2003) ("§ 523(a)(3)(B) preserves for certain omitted creditors the right to litigate the dischargeability of a debt under § 523(a)(2), (4) or (6) after the expiration of the period within which scheduled creditors must file complaints."); In re Rice, 2010 WL 749814 at *2 (noting the § 523(a)(3)(B) exception from discharge applies as long as the creditor lacked notice or actual knowledge of the case which prevented timely filing); In re Garrett, 266 B.R. 910, 914 (Bankr. S.D. Ga. 2001) ("Because a court cannot grant an extension of this deadline unless a request is made before the time has expired, Section 523(a)(3)(B) excepts from discharge any 'fraud type' debt neither listed nor scheduled in time to permit a creditor to file a dischargeability complaint.").

---

[22]"Subject to the [Section] 523(a)(3)(B) caveat applicable to debts not scheduled by the Debtor, the effect of [Section] 523(c)(1) is that the bankruptcy court has exclusive jurisdiction to determine the dischargeability of debts for money or property obtained by false pretenses or fraud..., debts for fraud or defalcation while acting in a fiduciary capacity or embezzlement or larceny..., debts for willful and malicious injury or damage by the debtor... ."  In re Merritt, 2001 WL 1699697, at *4 (Bankr. M.D.N.C. Aug. 30, 2001).

[23]It should be noted that a minority of courts have held that a failure to timely schedule a creditor automatically exempts the debt, however, the majority of courts require the creditor to prove the merits of the claim, or at minimum, that the creditor holds a viable Section 523(a)(2), (4), or (6) claim.  See In re Jones, 296 B.R. 447 (Bankr. M.D. Tenn. 2003) (discussing cases).

17

A complaint brought under Section 523(a)(3)(B) is governed by Rule 4007(b) rather than Rule 4007(c), and may be filed at any time.  In re Campbell, 2011 WL 867176, at *3 (W.D. Va. Mar. 11, 2011).  Pursuant to Rule 4007(b), there is no deadline to file a complaint objecting to the discharge of a debt under any other subsection of Section 523(a), thus, no extension is needed for Morgan to file such an action.

For the reasons stated, as to the extension of time for Morgan to challenge the dischargeability of the Debtor's alleged debts to him, the Motion to Extend will be denied.

<u>CONCLUSION</u>

The Debtor owns the Vehicle and Morgan must turn it over  There is no need for the parties to proceed with their litigation in state court.  Therefore the Motion for Relief will be denied, the Turnover Motion will be granted, and the Motion to Extend will be denied.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Rule 9021.

END OF DOCUMENT